# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

### EAST OHIO GAS COMPANY DBA
### DOMINION ENERGY OHIO,

Plaintiff-Appellant,

v.

### CITY OF YOUNGSTOWN,

Defendant-Appellee.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 19 MA 0007**

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2017 CV 02750

**BEFORE:**
Gene Donofrio, Chery L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Richard Cline* and *Atty. Adam Smith,* McDonald Hopkins LLC, 600 Superior Avenue, East, Suite 2100, Cleveland, Ohio 44114, for Plaintiff-Appellant, and

*Atty. Eugene Fehr*, Deputy Law Director, 26 South Phelps Street, Fourth Floor, Law Department, Youngstown, Ohio 44503, for Defendant-Appellee.

Dated:
February 26, 2020

---

**Donofrio, J.**

{¶1}     Plaintiff-appellant, the East Ohio Gas Company d/b/a Dominion Energy Ohio (Dominion), appeals from a Mahoning County Common Pleas Court judgment awarding summary judgment in favor of defendant-appellee, the City of Youngstown (the City), on appellant's declaratory judgment action regarding which party is to bear the cost of relocating Dominion's natural gas pipeline.

{¶2}     At the center of this case is a 400-foot section of sanitary sewer pipeline that runs under Phelps Street in Youngstown between Federal Street and Commerce Street.

{¶3}     On February 17, 2010, Youngstown City Council passed Ordinance No. 10-54, authorizing the City's Board of Control to take bids and enter into a contract for the Phelps Street Combined Sewer Replacement Project (Sewer Replacement Project).  The ordinance provided:

> The project will entail replacing an existing 24" combined brick sewer located on Phelps Street between Lincoln Avenue and Federal Street with a new combined sewer.  The existing sewer is in poor condition and full replacement is warranted and recommended.

{¶4}     In January 2011, the City hired MS Consultants, Inc. (MS Consultants) to provide design services for the Sewer Replacement Project.  MS Consultants requested information from Dominion, AT&T Transmission (AT&T), and Ohio Edison Company (Ohio Edison) as to the location of their underground utility lines on Phelps Street.  Dominion's natural gas pipeline was located beneath the sidewalk on Phelps Street.

{¶5}     The City awarded the bid on the excavation work to Marucci and Gaffney Excavating (M&G).  When M&G began work on the project on February 4, 2013, workers discovered that AT&T's and Ohio Edison's duct banks and vaults, which housed their

Case No. 19 MA 0007

utility lines, had not been properly identified on the plans. Consequently, M&G could not proceed with the project.

{¶6}     Once the City obtained information on the location of the AT&T and Ohio Edison duct banks and vaults, it was determined that those utilities would have to be completely relocated in order to replace and repair the sewer pipeline. It was further determined that the AT&T and Ohio Edison duct banks would be relocated to the northern sidewalk along Phelps Street. Dominion claimed this would interfere with its pipeline. Dominion too was required to relocate its pipeline. According to Dominion, it was forced to move its pipeline to accommodate AT&T's and Ohio Edison's duct banks and vaults. According to the City, Dominion had to relocate its pipeline because it was in direct conflict with the sewer pipeline replacement.

{¶7}     Dominion and the City subsequently entered into the Cooperation Agreement for Relocation of Utilities (Cooperation Agreement) in order to avoid delaying the Sewer Replacement Project. Under the terms of the Cooperation Agreement, Dominion agreed to advance the cost of relocating its pipeline and the City agreed to deposit $150,000 in escrow. The parties agreed to then litigate who would be responsible for the cost of relocating Dominion's pipeline.

{¶8}     Dominion filed a complaint for declaratory judgment against the City on October 16, 2017, pursuant to the Cooperation Agreement. The complaint asserted that the City's maintenance, operation, and upkeep of a sewer system is a proprietary function. It further asserted that Dominion's pipeline was not in conflict with the anticipated repair and maintenance of the sewer pipeline and that Dominion was forced to relocate its pipeline only because the City directed that AT&T's duct bank be relocated to the same location Dominion's pipeline was already occupying. Therefore, Dominion sought a declaratory judgment that the City was required to reimburse it for its relocation costs. The City filed a counterclaim seeking a declaration that Dominion had a common law duty to relocate its pipeline at its own cost to make way for public improvements.

{¶9}     The City subsequently awarded the bid on the Sewer Replacement Project to M&G and work commenced. Dominion paid $170,838.03 to relocate its pipeline.

{¶10}    Dominion filed a motion for summary judgment. It argued that the City's actions were an improper exercise of municipal authority. The City filed a competing

motion for summary judgment. It argued that a municipality can require a public utility to relocate it facilities at the utility's expense in order to accommodate the governmental utility operations of the municipality, including the reconstruction or replacement of a sanitary sewer.

**{¶11}** The trial court granted the City's motion for summary judgment and denied Dominion's motion. In so doing, the court noted that in accordance with common law, utilities are required to relocate their facilities within a public right-of-way at their own expense when requested to do so by a municipality in order to reconstruct a sewer. It found that sewer reconstruction is a governmental activity in the interest of the public health and welfare and is an appropriate exercise of the municipality's police power. Therefore, the court declared that Dominion was to bear the cost of relocating its pipeline and that the City was not responsible for payment of any of the relocation costs.

**{¶12}** Dominion filed a timely notice of appeal on January 8, 2019. It now raises two assignments of error asserting the trial court erred in granting the City's motion for summary judgment.

**{¶13}** An appellate court reviews a summary judgment ruling de novo. *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8. Thus, we shall apply the same test as the trial court in determining whether summary judgment was proper.

**{¶14}** A court may grant summary judgment only when (1) no genuine issue of material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) the evidence can only produce a finding that is contrary to the non-moving party. *Mercer v. Halmbacher*, 9th Dist. Summit No. 27799, 2015-Ohio-4167, ¶ 8; Civ.R. 56(C). The initial burden is on the party moving for summary judgment to demonstrate the absence of a genuine issue of material fact as to the essential elements of the case with evidence of the type listed in Civ.R. 56(C). *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996). If the moving party meets its burden, the burden shifts to the non-moving party to set forth specific facts to show that there is a genuine issue of material fact. *Id.*; Civ.R. 56(E). "Trial courts should award summary judgment with caution, being careful to resolve doubts and construe evidence in favor of the nonmoving party." *Welco Industries, Inc. v. Applied Cos.*, 67 Ohio St.3d 344, 346, 617 N.E.2d 1129 (1993).

**{¶15}** Dominion's first assignment of error states:

Case No. 19 MA 0007

THE TRIAL COURT ERRED IN FINDING PLAINTIFF/APPELLANT THE EAST OHIO GAS COMPANY, D/B/A DOMINION ENERGY OHIO ("DEO"), RESPONSIBLE FOR THE COSTS OF RELOCATING ITS NATURAL GAS PIPELINE AND IMPACTED SERVICES ("DEO'S PIPELINE") WHERE SUCH RELOCATION WAS ORDERED BY DEFENDANT/APPELLEE THE CITY OF YOUNGSTOWN ("COY") BOTH (A) TO PERMIT ANOTHER PUBLIC UTILITY TO MOVE INTO THE SAME LOCATION PREVIOUSLY OCCUPIED BY DEO'S PIPELINE AND (B) TO ENGAGE IN THE PROPRIETARY FUNCTION OF REPAIRING AN OLD, RAPIDLY DETERIORATING SECTION OF SEWER PIPELINE IN THE COURSE OF ORDINARY, ONGOING MAINTENANCE.

{¶16} In this assignment of error, Dominion argues that the Sewer Replacement Project is a proprietary, as opposed to a governmental, function. It goes on to argue that utility relocation necessitated by proprietary operations must be paid for by the municipality. Dominion asserts that while the construction of a sewer system is a governmental function, the operation and upkeep of the sewers is a proprietary function. It contends that maintenance problems are those that are remedied by repairs and attention to general deterioration.

{¶17} Dominion asserts the evidence demonstrates that the sewer pipeline was rapidly deteriorating due to a lack of maintenance and upkeep, which resulted in the City initiating the Sewer Replacement Project. It argues that when a municipality is engaging in normal, ongoing maintenance, even when the municipality has allowed the facility to reach a deteriorating condition, the municipality is engaging in a proprietary function as a matter of law. Because the Sewer Replacement Project is proprietary in nature, Dominion contends, it is entitled to its relocation costs of $170,838.03.

{¶18} The determinative issue in this assignment of error is whether the Sewer Replacement Project constituted a governmental function or a proprietary function.

{¶19} A municipality cannot require public utilities using public streets to relocate their facilities at their own expense to accommodate the municipality's proprietary function. *State ex rel. Speeth v. Carney*, 163 Ohio St. 159, 177-178, 126 N.E.2d 449

(1955). "A governmental subdivision in the exercise of its proprietary functions is in the same position as a private utility attempting to force such relocation." *Id.* at 178.

{¶20}   But a municipality can require public utilities to relocate their lines at their own expense in order to accommodate the municipality's governmental function. *Duke Energy Ohio, Inc. v. Cincinnati*, 1st Dist. Hamilton No. C-140763, 2015-Ohio-4844, ¶ 24. The United States Supreme Court has long held, "when a utility company makes use of the public right of way, the municipality may require the company to relocate its equipment at its own cost when the public welfare so requires." *Perrysburg v. Toledo Edison Co.*, 171 Ohio App.3d 174, 2007-Ohio-1327, 870 N.E.2d 189 (6th Dist.) ¶ 16, quoting *New Orleans Gaslight Co. v. Drainage Commission of New Orleans*, 197 U.S. 453, 462, 25 S.Ct. 471, 49 L.Ed. 831 (1905).

{¶21}   R.C. 2744.01 defines "governmental function" and "proprietary function" in the context of sovereign immunity. The definitions are instructive in this case as well.

{¶22}   A "governmental function" is a function of a political subdivision that is specified in R.C. 2744.01(C)(2) or that satisfies any of the following:

> (a) A function that is imposed upon the state as an obligation of sovereignty and that is performed by a political subdivision voluntarily or pursuant to legislative requirement;
>
> (b) A function that is for the common good of all citizens of the state;
>
> (c) A function that promotes or preserves the public peace, health, safety, or welfare; that involves activities that are not engaged in or not customarily engaged in by nongovernmental persons; and that is not specified in division (G)(2) of this section as a proprietary function.

R.C. 2744.01(C)(1). A "governmental function" includes "[t]he provision or nonprovision, planning or design, construction, or reconstruction of a public improvement, including, but not limited to, a sewer system[.]" R.C. 2744.01(C)(2)(l).

{¶23}   A "proprietary function" is a function of a political subdivision that is specified in R.C. 2744.01(G)(2) or that satisfies both of the following:

Case No. 19 MA 0007

(a) The function is not one described in division (C)(1)(a) or (b) of this section and is not one specified in division (C)(2) of this section;

(b) The function is one that promotes or preserves the public peace, health, safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons.

R.C. 2744.01(G)(1). A "proprietary function" includes "[t]he maintenance, destruction, operation, and upkeep of a sewer system[.]" R.C. 2744.01(G)(2)(d).

{¶24} Specifically as to sewer systems, the Ohio Supreme Court has stated:

The weight of authority holds that the construction and institution of a sewer system is a governmental matter, and that there is no liability for mere failure to construct sewers. However, the weight of authority is equally decisive in holding that the operation and upkeep of sewers is not a governmental function, but is a ministerial or proprietary function of the city.

*Portsmouth v. Mitchell Mfg. Co.*, 113 Ohio St. 250, 255, 148 N.E. 846 (1925). The Court has elaborated on why sewer construction is a governmental function:

The function of public drainage, then, arises under the police power, and certainly the power to construct public sewers constitutes a part of the police power, for such sewers are established for the express purpose of preserving the public health. This being the case, the function is purely governmental.

*Hutchinson v. City of Lakewood*, 125 Ohio St. 100, 104, 180 N.E. 643 (1932).

{¶25} In this case, Dominion argues that the Sewer Replacement Project was a maintenance project to remedy deterioration and, therefore, was a proprietary rather than a governmental function.

{¶26} The more discretion and work involved, the more likely the sewer issue is to be considered a governmental function:

Case No. 19 MA 0007

> [W]hen remedying the sewer problem would involve little discretion but, instead, would be a matter of routine maintenance, inspection, repair, removal of obstructions, or general repair of deterioration, then the complaint is properly characterized as a maintenance, operation, or upkeep issue. * * * When remedying a problem would require a city to, in essence, redesign or reconstruct the sewer system, then the complaint presents a design or construction issue.

(Internal citations omitted); *Essman v. City of Portsmouth*, 4th Dist. Scioto No. 09CA3325, 2010-Ohio-4837, ¶ 32.

**{¶27}** Dominion relies in part on two statements the City made in its answer and counterclaim. In its answer, the City stated: "The Phelps Street Sewer is a 24 inch brick culvert that is over 100 years old and is rapidly deteriorating, threatening to collapse all of the infrastructure, including the roadway, above it." (Counterclaim ¶ 4). The City also referred to the Sewer Replacement Project as "replacement or maintenance." (Counterclaim ¶ 5). Dominion argues that these "admissions" make clear that the Sewer Replacement Project is one of maintenance and upkeep, thus making it a proprietary function.

**{¶28}** But given the vast scope of the Sewer Replacement Project and the fact that the sewer had to be completely replaced and reconstructed, it constituted a governmental function.

**{¶29}** In proceeding with the Sewer Replacement Project, the City passed two ordinances. Youngstown City Ordinance No. 10-54 recognized that the sewer pipeline was in poor condition and that "full replacement is warranted and recommended." Youngstown City Ordinance No. 15-25 likewise stated that the sewer pipeline was in severe disrepair "must be replaced." Thus, the City viewed the Sewer Replacement Project as a means to completely replace the existing sewer pipeline, not to simply maintain or repair it.

**{¶30}** Dominion also points to superintendent of the wastewater treatment plant, Thomas Mirante III's deposition testimony that repairing the sewer pipeline is part of "normal ongoing maintenance." (Mirante Dep. 39). But Dominion fails to point out that

Mirante further stated that the maintenance was to assess which sewers need to be *replaced.* (Mirante Dep. 39).

**{¶31}** Dominion further contends that the City characterized the repair and maintenance of the sewer pipeline as a proprietary function for accounting purposes. (Mirante Dep. 46-48; Bozanich Dep. 27-28).

**{¶32}** But again Dominion fails to follow up with the rest of the deposition testimony. David Bozanich was the City's finance director at the relevant time. He explained that for accounting purposes, the City categorizes proprietary or enterprise activities separate from governmental activities. (Bozanich Dep. 27). The difference, Bozanich explained, was how the activity was funded. (Bozanich Dep. 27). An enterprise or proprietary activity is funded by a user fee whereas a government activity is funded by a tax. (Bozanich Dep. 27-28). Bozanich stated that anything having to do with water operations, waste water operations, and sanitation operations is paid by enterprise funds. (Bozanich Dep. 28). Thus, how the City categorized the funding for the Sewer Replacement Project for accounting purposes has no bearing on whether it actually constituted a governmental or proprietary function. If it did, then anything having to do with waste water and sanitation, including the new construction of a sanitary sewer, could never constitute a governmental function.

**{¶33}** Next, Dominion points to the General Notes contained in the project plans approved by the City. It claims the General Notes provided that in the event of a direct conflict with a utility, the contractor was to coordinate the relocation with the utility company and that compensation would be provided to the utility company. (Pierko Dep. Ex.2).

**{¶34}** But once again, Dominion fails to read the entire testimony. The General Notes specifically provide:

> The contractor must support and protect all existing utilities encountered during construction. The cost shall be included in the unit bid price for installation of the sewer. In the event a direct conflict occurs with a utility, as pre-determined by the engineer, the contractor shall coordinate the relocation or replacement with the utility company. Compensation shall be provided under the terms of the agreement.

Case No. 19 MA 0007

(Pierko Dep. 77-78, Ex. 2). Dominion's attorney asked MS project manager John Pierko if this provision meant that the contractor would compensate the utility company. (Pierko Dep. 78). Pierko stated that it did not. (Pierko Dep. 78). Pierko stated that the entire paragraph had to be read, which led to the conclusion that if the contractor were to encounter an unforeseen relocation that was not shown on the drawings then it was agreed that the contractor would be entitled to additional compensation. (Pierko Dep. 79-80).

{¶35} In addressing an immunity issue this court was faced with whether certain drainage sewer work was a governmental or proprietary function. We determined that "when Austintown covered the drainage ditch and installed the pipe and catch basin, it had provided/redesigned/constructed a new sewer, not maintained it." *Ivory v. Austintown Twp.*, 7th Dist. Mahoning No. 10 MA 106, 2011-Ohio-3171, ¶ 19. We concluded that sewer design and construction is a governmental, not proprietary, function. *Id.*

{¶36} The Tenth District, also while analyzing an immunity question, determined: "The replacement of a storm sewer line constitutes the construction or reconstruction of a sewer system, not the maintenance and upkeep of a sewer system nor the maintenance of a water supply system. Therefore, this work constituted a governmental function." *Repasky v. Upper Arlington*, 10th Dist. Franklin No. 12AP-752, 2013-Ohio-2516, ¶ 13.

{¶37} The evidence in this case is uncontroverted that the Sewer Replacement Project was more than ordinary maintenance or upkeep. Instead, the entire 100-year-old sewer had to be replaced and reconstructed. Thus, the trial court was correct in finding that the Sewer Replacement Project was a governmental function. As such, summary judgment in the City's favor was proper since the utility company (in this case Dominion) was required to pay for the relocation of its gas line that occupied the public right-of-way.

{¶38} Accordingly, Dominion's first assignment of error is without merit and is overruled.

{¶39} Dominion's second assignment of error states:

THE TRIAL COURT ERRED IN FAILING TO FIND, OR EVEN ADDRESS, THAT COY DISCRIMINATED AGAINST AND DISPARATELY

TREATED DEO IN VIOLATION OF R.C. 4939.04(A) AND OHIO COMMON LAW BY (A) DIRECTING AND ALLOWING ONE PUBLIC UTILITY TO OCCUPY THE EXACT SAME LOCATION DEO WAS LAWFULLY OCCUPYING WITH DEO'S PIPELINE AND (B) BY PAYING BETWEEN $900,000.00 AND $1,000,000.00 FOR RELOCATING DUCT BANKS AND VAULTS OF TWO OTHER PUBLIC UTILITIES, YET REFUSING TO PAY DEO'S RELOCATION COSTS IN THE AMOUNT OF $170,838.03.

{¶40} Pursuant to R.C. 4939.04(A)(1): "A municipal corporation shall provide public utilities or cable operators with open, comparable, nondiscriminatory, and competitively neutral access to its public ways."

{¶41} Dominion contends it is undisputed that its pipeline was not in direct conflict with the sewer pipeline. (Shasho Dep. 82-83). It further claims it is undisputed that the only reasons AT&T and Ohio Edison had to relocate their duct banks and vaults was because (1) they were in direct conflict with the sewer pipeline and (2) the City had allowed the sewer pipeline to fall into such a state of disrepair that it could not use a CIP liner to simply repair the sewer pipeline. Due to AT&T's and Ohio Edison's conflicts and deterioration of the sewer pipeline, the City relocated AT&T's duct bank to the location that Dominion was lawfully occupying forcing Dominion to relocate its pipeline to a less favorable location. Based on these fact, Dominion argues, the trial court should have concluded that the City discriminated against it. What makes the situation more egregious, Dominion asserts, is that the City paid between $900,000 and $1,000,000 to relocate AT&T's and Ohio Edison's duct banks and vaults.

{¶42} The City, however, states it did not incur AT&T's and Ohio Edison's relocation costs. Therefore, the City argues it did not discriminate against Dominion.

{¶43} Pursuant to R.C. 4939.04(A):

(1) A municipal corporation shall provide public utilities or cable operators with open, comparable, nondiscriminatory, and competitively neutral access to its public ways.

Case No. 19 MA 0007

(2) Nothing in division (A)(1) of this section prohibits a municipal corporation from establishing priorities for access to or occupancy or use of a public way by a public utility or cable operator when the public way cannot accommodate all public way occupants or users, which priorities as applied to public utilities or cable operators shall not be unduly discriminatory and shall be competitively neutral.

**{¶44}** Thus, the City was required to provide Dominion with open, nondiscriminatory, and competitively neutral access to its public ways.

**{¶45}** Dominion relied on statements by the deputy director of public works for the City, Charles Shasho, to support its claim that it was undisputed that its pipeline was not in direct conflict with the sewer pipeline. (Shasho Dep. 82-83). But while Shasho did make a statement to that effect, that was not the entirety of his deposition testimony.

**{¶46}** Shasho stated that once it was determined that the AT&T and Ohio Edison duct banks would have to be relocated to excavate the sewer this "partially" gave rise to the conflict with Dominion. (Shasho Dep. 34). Shasho stated that also the excavation of the sewer as well as the roadway improvements that went along with it would necessitate Dominion to relocate its pipeline. (Shasho Dep. 34). He stated that the sewer that needed to be replaced ran at a lower depth than the Dominion gas pipeline. (Shasho Dep. 35-36). And in order to excavate to reach the sewer there would be a lack of support of the gas pipeline, which could potentially collapse. (Shasho Dep. 37). So while there was no direct conflict between the new sewer and Dominion's pipeline, the sewer work could not proceed without Dominion relocating its pipeline.

**{¶47}** Moreover, as the City points out, while it initially funded the installation of the AT&T duct bank, this was just to get the project moving forward. (Shasho Dep. 102). The City never agreed that it would not seek reimbursement from AT&T. (Shasho Dep. 95-97; Maynard Dep. 93). And AT&T paid for relocation and placement of its cable, splicing, and construction of a new manhole, which exceeded $350,000. (Maynard Dep. 41-42, 77-78, 87-88). Thus, AT&T incurred significantly more costs than Dominion. Additionally, Youngstown Thermal was required to relocate its steam lines, which it did at its own cost. (Mulichak Dep. 83-84). And there is no evidence in the record as to what the cost was to relocate the Ohio Edison line or who paid it.

**{¶48}** Thus, the record does not contain any evidence that the City failed to provide Dominion with open, nondiscriminatory, and competitively neutral access to its public ways.

**{¶49}** Accordingly, Dominion's second assignment of error is without merit and is overruled.

**{¶50}** For the reasons stated above, the trial court's judgment is hereby affirmed.

Waite, P. J., concurs.

Robb, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**